BRAUNING, APPELLANT, *v.* CINCINNATI GAS & ELECTRIC COMPANY, ET AL., APPELLEES.

(No. C-880029—Decided
January 18, 1989.)

*John H. Metz,* for appellant.

*Taft, Stettinius & Hollister* and *Gerald J. Rapien,* for appellee Cincinnati Gas & Electric Co.

*Rendigs, Fry, Kiely & Dennis* and *Edward R. Goldman,* for appellee city of Sharonville.

*Per Curiam.* This cause came on to be heard upon an appeal from the Court of Common Pleas of Hamilton County, Ohio.

Appellant John W. Brauning has taken the instant appeal from the entry of summary judgment for appellees the Cincinnati Gas & Electric Company ("CG&E") and the city of Sharonville ("Sharonville") on appellant's complaint seeking damages for personal injuries sustained when a metal light pole that appellant and his employer were resetting in Sharonville came into contact with electrical power lines erected and maintained by CG&E. On appeal, appellant advances two assignments of error.

In January of 1984, appellant was employed as an electrician's assistant by Wilson Enterprises, a sole proprietorship owned by defendant Mark C. Wilson ("Wilson"). Wilson Enterprises performed private contract work and was engaged by Sharonville on a regular basis for a variety of projects.

On August 13, 1984, Sharonville authorities contacted Wilson to report that a light pole at an intersection within the city limits had been struck by a car and dispatched him to the site. Wilson, with appellant's assistance, removed the light pole from traffic signal wiring upon which it rested and lowered the pole onto the berm adjacent to the road. Later that evening, Sharonville authorities again contacted Wilson and instructed him to reset the pole.

The following afternoon, appellant arrived at the site, removed the damaged pole base and replaced it with a new base. Shortly thereafter, Wilson arrived in a bucket truck and parked the truck directly under electrical power lines which ran across the road. Appellant and Wilson tied one end of a length of rope to the mast arm of the light pole and the other end of the rope to a boom extending from the bucket. Wilson operated the boom by remote control, and as he lifted the light pole from the ground toward a vertical position, he instructed appellant to guide the bottom of the pole to the base. The pole suddenly twisted, and the mast arm came into contact with a 7200-volt, uninsulated power line with appellant in direct contact with the bottom of the light pole. Appellant sustained severe burns and suffered the amputation of his left leg and his right small toe.

On October 30, 1984, appellant brought an action against CG&E,

Sharonville, Wilson and Wilson Enterprises seeking damages for injuries sustained in the accident. The appellees subsequently moved for summary judgment on the complaint. Following a hearing, the trial court denied the motion of Wilson and Wilson Enterprises, but granted summary judgment for CG&E and Sharonville. Appellant's appeal from the entry of summary judgment for CG&E and Sharonville is before us upon the trial court's Civ. R. 54(B) certification.

Appellant alleged in his complaint that CG&E was negligent in erecting its power lines too close to the ground, to the roadway and to other structures for the amount of current carried through the lines or, in the alternative, in carrying an amount of current through the lines too high for the distance of the lines from the ground, the roadway and other structures. Appellant alleged that Sharonville was negligent in failing to furnish a safe place for him to work and in failing to warn him of the dangers presented. Liability for negligence is predicated upon injury caused by the failure to discharge a duty owed to the injured party. *Moncol* v. *Bd. of Education* (1978), 55 Ohio St. 2d 72, 9 O.O. 3d 75, 378 N.E. 2d 155. Thus, to sustain an action founded upon negligence, a plaintiff must demonstrate: (1) that the defendant had a duty, recognized by law, requiring him to conform his conduct to a certain standard for the protection of the plaintiff; (2) that the defendant failed to conform his conduct to that standard; and (3) that the defendant's conduct proximately caused the plaintiff to sustain actual loss or damage. See *id.*

The standard governing the disposition of the motions of CG&E and Sharonville for summary judgment is set forth in Civ. R. 56. Pursuant thereto, a party against whom a claim is asserted may move, with or without supporting affidavits, for summary judgment in his favor on all or any part of the claim. Civ. R. 56(B). A motion for summary judgment may be granted if the court, upon viewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion, determines: (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law; and (3) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267; Civ. R. 56(C).

Appellant, in his first assignment of error, challenges the entry of summary judgment for CG&E. We find this challenge to be well-taken.

A company engaged in the transmission and distribution of electrical current has a duty "to exercise the highest degree of care consistent with the practical operation of its business in the construction, maintenance and inspection of its equipment." *Otte* v. *Dayton Power & Light Co.* (1988), 37 Ohio St. 3d 33, 523 N.E. 2d 835; *Hetrick* v. *Marion-Reserve Power Co.* (1943), 141 Ohio St. 347, 25 O.O. 467, 48 N.E. 2d 103. The dispute between plaintiff and CG&E centers on whether CG&E, in the installation and maintenance of the subject power lines, conformed its conduct to that standard.

In support of its motion for summary judgment, CG&E cited its compliance with the National Electric Safety Code ("NESC") in the erection and maintenance of its power lines. Table 232-1 of the NESC sets forth the clearance requirements for wires, con-

ductors and cables above ground and mandates a vertical clearance of twenty feet for open supply line conductors of 750 to 22,000 volts that cross over or overhang roads and streets subject to truck traffic. Table 234-1 sets forth the clearance requirements for wires, conductors and cables passing by but not attached to buildings and other installations, except bridges, and mandates a horizontal and vertical (above and below) clearance of five feet between open supply line conductors of 750 to 8,700 volts and signs, chimneys, radio and television antennas, tanks and other installations not classified as buildings or bridges. CG&E established by affidavit that the subject power lines included two 7,200-volt primary conductors, that the point of contact between the light pole and the power line had a vertical distance from the roadway of over thirty-one feet, and that the light pole, in its fixed position, was thirteen feet from the nearest power line.

Appellant does not dispute CG&E's claim of compliance with the vertical and horizontal clearance requirements of the NESC. He argues, instead, that CG&E's installation and maintenance of the subject power lines violated general, if not specific, provisions of the NESC, and in the alternative, he asserts that compliance with the NESC is not dispositive of the issue of CG&E's liability.

Accompanying appellant's memorandum in opposition to CG&E's motion for summary judgment was the affidavit of an electrical engineer who expressed his expert opinion that CG&E "clearly violated [NESC] rules 200, 210, 211 and 214." Part 2 of the NESC prescribes rules for the installation and maintenance of overhead electric lines. Subsection 200 presents a general statement of the purpose of the rules.[1] Section 21 of part 2 sets forth general requirements for design and construction (subsection 210), installation and maintenance (subsection 211), and inspection and tests of lines and equipment (subsection 214).[2] We

---

[1] Subsection 200 of section 20 under part 2 of the NESC provides:

"PART 2. SAFETY RULES FOR THE INSTALLATION AND MAINTENANCE OF OVERHEAD ELECTRIC SUPPLY AND COMMUNICATION LINES.

"Section 20, Purpose, Scope, and Application of Rules.

"200. Purpose of Rules

"The purpose of these rules is the practical safeguarding of persons from hazards arising from the installation, operation, or maintenance of overhead supply and communication lines and their associated equipment. They contain provisions considered necessary for the safety of employees and the public. They are not intended as a design specification or an instruction manual. Construction should be made in accordance with accepted good practice for the given local conditions in all particulars not specified in the rules."

[2] Subsections 210, 211 and 214 of section 21 provide:

"Section 21. General Requirements

"210. Design and Construction

"All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated.

"211. Installation and Maintenance

"All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as is practical.

"* * *

"214. Inspection and Tests of Lines and Equipment

"A. When In Service.

"1. Initial Compliance with Rules Lines and equipment shall comply with these safety rules when placed in service.

"2. Inspection

"Lines and equipment shall be in-

find that these subsections constitute expressions of the general considerations which underlie the more specific standards set forth in the NESC tables. Therefore, we conclude that appellant failed to establish a genuine issue of material fact with respect to CG&E's compliance with the NESC.

Appellant argues in the alternative that CG&E's compliance with the NESC is not dispositive of the issue of liability. We agree.

In *Hetrick* v. *Marion-Reserve Power Co., supra,* the Ohio Supreme Court established the duty of a power company "* * * to exercise the highest degree of care consistent with the practical operation of * * * [its] business in the construction, maintenance and inspection of * * * [its] equipment." *Id.* at 355, 25 O.O. at 471, 48 N.E. 2d at 107. The court noted that the NESC "is nationally known and nationally recognized by electrical engineers as authority in the erection and maintenance of equipment for transmission and distribution of electrical energy," *id.* at 358, 25 O.O. at 472, 48 N.E. 2d at 108, and held that the power company was not negligent in the erection and maintenance of its power lines when the evidence was undisputed that the installation and maintenance of the lines were in conformity with the NESC, *id.,* and when the plaintiff's decedent died as a result of an unusual and unforeseeable occurrence that was not within the range of reasonable probability. *Id.* at paragraph three of the syllabus.

In subsequent decisions, courts have found the standard of care announced in *Hetrick* to require a power company to demonstrate more than mere compliance with the NESC to escape liability. In *Kohli* v. *Pub. Util. Comm.* (1985), 18 Ohio St. 3d 12, 18 OBR 10, 479 N.E. 2d 840, the court's decision turned on the procedural context of the appellants' claim. However, the court in *dicta* noted that the standard of care imposed in *Hetrick* was "'the highest degree of care'" and "[p]arenthetically * * * remind[ed] the utilities that the range of their responsibilities to the public is not limited solely by industry standards and commission regulations." *Kohli, id.,* at 14-15, 18 OBR at 12, 479 N.E.2d at 842. In *Dolata* v. *Ohio Edison Co.* (1981), 2 Ohio App. 3d 293, 2 OBR 324, 441 N.E.2d 837, the Court of Appeals for Medina County cited *Hetrick* in support of its determination that, despite its compliance with the NESC, a power company may be held liable in negligence for an injury that might have been anticipated with a reasonable degree of probability.

---

spected from time to time at such intervals as experience has shown to be necessary.

"3. Tests

"When considered necessary, lines and equipment shall be subjected to practical tests to determine required maintenance.

"4. Record of Defects

"Any defects affecting compliance with this code revealed by inspection or tests, if not promptly corrected, shall be recorded; such records shall be maintained until the defects are corrected.

"5. Remedying Defects

"Lines and equipment known to be defective so as to endanger life or property shall be promptly repaired, disconnected, or isolated.

"B. WHEN OUT OF SERVICE

"1. Lines Infrequently Used

"Supply lines and equipment infrequently used shall be inspected to see that they are in safe condition for service.

"2. Lines Temporarily Out of Service

"Lines temporarily out of service shall be maintained in such condition that a hazard will not be created.

"3. Lines Permanently Abandoned

"Lines permanently abandoned shall be removed or maintained in a safe condition."

Implicit in the Ohio Supreme Court's most recent articulation of the standard of care required of public utilities is the proposition that "a public utility necessarily meets the required 'higher [*sic*] degree of care' test simply by following industry standards such as the National Electric Safety Code." *Otte* v. *Dayton Power & Light Co., supra,* at 42, 523 N.E.2d at 843 (Locher, J., concurring in part, dissenting in part). The court in *Otte* declined to adopt strict liability for public utilities upon its determination that the standard of care announced in *Hetrick, supra,* was commensurate with the danger inherent in the delivery of electricity. In its discussion of the standard of care established in *Hetrick,* the majority stated that, in cases which present the issue of whether a utility has exercised the highest degree of care, the NESC sets the standards for the installation, inspection and maintenance of its equipment and that compliance with the NESC was "the key to the utility's success in *Hetrick* * * *." *Otte, supra,* at 39, 523 N.E.2d at 841.

Although the opinion of the majority in *Otte* suggests that mere compliance with the NESC constitutes conformity with the standard of care established in *Hetrick,* such a determination was not critical to the court's disposition of the issue presented in the case, and the holding of *Otte* must be limited to its syllabus, which states that "[s]trict liability in tort for damages caused by neutral-to-earth voltage is not a cause of action that may be asserted against a public utility." We, therefore, conclude consistent with *Hetrick* and its progeny, that proof of a utility's compliance with the NESC, although probative of the utility's conformity with the requisite standard of care, is not dispositive of that issue.

As we noted *supra,* the court in

*Hetrick* held that a power company was not negligent in the installation and maintenance of its power lines when the lines were erected and maintained in compliance with the NESC and when the death of the plaintiff's decedent resulted from an unusual and unforeseeable occurrence that was not within the range of reasonable probability. CG&E asserts that the evidentiary material submitted in support of its motion for summary judgment demonstrates not only its compliance with the NESC, but also the unforeseeable nature of the occurrence that resulted in plaintiff's injuries. We are unpersuaded.

Upon consideration of a motion for summary judgment, the burden of demonstrating that no genuine issue exists as to any material fact is on the moving party, and the party opposing the motion is entitled to have the evidence construed most strongly in his favor. Civ. R. 56(C); *Toledo's Great Eastern Shoppers City, Inc.* v. *Abde's Black Angus Steak House* (1986), 24 Ohio St. 3d 198, 24 OBR 426, 494 N.E. 2d 1101. When the evidentiary material submitted in support of a motion for summary judgment does not establish the absence of a genuine issue of fact for trial, summary judgment must be denied. *Id.* at 202, 24 OBR at 429, 494 N.E.2d at 1104. Viewing the inferences to be drawn from the facts set forth in the pleadings and supporting evidentiary material in a light most favorable to appellant, we find that an issue of fact remains as to whether appellant was injured as a result of an unusual and unforeseeable occurrence that was not within the range of reasonable probability. We, therefore, conclude that summary judgment was improvidently entered for CG&E on appellant's complaint, and accordingly, we sustain appellant's first assignment of error.

Appellant, in his second assign-

ment of error, contends that the trial court erred in granting summary judgment for Sharonville. This contention is feckless.

Appellant alleged in his complaint that Sharonville was negligent in failing to furnish him with a safe place to work and in failing to warn him of the dangers presented. R.C. 4101.11, which imposes upon an employer a duty to protect employees and frequenters, provides that:

"Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters."

R.C. 4101.12 imposes on an employer the duty to furnish to employees and frequenters a safe place of employment, providing that:

"No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and places of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe."

At the time of the accident, appellant was not an employee of Sharonville; he was an employee of Wilson Enterprises, an independent contractor engaged by Sharonville to perform work on premises owned and controlled by the city. R.C. 4101.01(E) defines a "frequenter" as any "person, other than an employee, who may go in or be in a place of employment under circumstances which render him other than a trespasser." Thus, the duty exacted from employers under R.C. 4101.11 and 4101.12 to protect employees and frequenters and to furnish them with a safe place to work extends to independent contractors on premises owned and controlled by the employer with whom they have contracted. *Cyr* v. *Bergstrom Paper Co.* (1982), 3 Ohio App. 3d 299, 3 OBR 345, 444 N.E. 2d 1349.

The duty imposed under R.C. 4101.11 and 4101.12 is similar to the common-law duty of an owner or occupier of premises to his invitees. An owner or occupier of premises is not an insurer; however, he owes a duty to his invitees to exercise ordinary care to maintain the premises in a reasonably safe condition and to warn of any latent dangers of which he knew or reasonably should have known. *Eicher* v. *United States Steel Corp.* (1987), 32 Ohio St. 3d 248, 512 N.E. 2d 1165; *Cyr, supra.*

However, the primary responsibility for protecting the employees of an independent contractor lies with the independent contractor. *Eicher, supra.* Thus, one who engages the service of an independent contractor ordinarily owes no duty of protection to the employees of the independent contractor when the independent contractor proceeds with knowledge and an appreciation of the danger that the work entails. *Wellman* v. *East Ohio Gas Co.* (1953), 160 Ohio St. 103, 51 O.O. 27, 113 N.E. 2d 629, paragraph

two of the syllabus. Appellant, in his deposition, stated that he did not recognize the danger presented by the overhead power lines and that Wilson did not direct his attention to it. Wilson admitted in his deposition that he was aware of the power lines and the danger that they presented, and he stated that, as a common practice, he discussed the danger of power lines with his employees. We find that, under the circumstances, it was incumbent upon Wilson to warn and protect appellant.

Appellant further contends that a duty on the part of Sharonville to warn and protect him arose by virtue of the authority of the Sharonville Safety-Service Director, reserved under section 139.02 of the Sharonville city ordinances, to supervise repairs and improvements.[3] One who engages the services of an independent contractor and actually participates in the work performed can be held liable for the injury of an employee of the independent contractor if he fails to eliminate a hazard that he, in the exercise of ordinary care, could have eliminated. *Hirschbach v. Cincinnati Gas & Electric Co.* (1983), 6 Ohio St. 3d 206, 6 OBR 259, 452 N.E. 2d 326, syllabus. However, one who engages the service of an independent contractor but does not actively participate in the work does not, merely by virtue of his supervisory capacity, owe a duty to employees of the independent contractor who are injured while engaged in inherently dangerous work. *Cafferkey v. Turner Constr. Co.* (1986), 21 Ohio St. 3d 110, 21 OBR 416, 488 N.E. 2d 189, syllabus.

It is clear from the evidentiary material submitted below that Sharonville merely instructed Wilson to erect the light pole. Wilson determined the method to be employed in resetting the pole, without consultation with Sharonville, and no agent of the city was present to supervise the work. Thus, despite its reservation of the power to supervise repairs and improvements, Sharonville did not actively participate in the resetting of the pole. As we noted *supra,* Wilson admitted in his deposition that he was aware of and appreciated the dangers inherent in the work. Thus, the primary responsibility for protecting plaintiff lay with Wilson, and Sharonville owed no duty of protection to appellant. We, therefore, find that no issue of fact remains as to whether Sharonville was negligent in failing to warn or protect appellant or to furnish him with a safe place to work and that Sharonville was entitled to summary judgment in its favor as a matter of law. Accordingly, we overrule appellant's second assignment of error.

Upon our determination that summary judgment was properly granted in favor of Sharonville, we affirm that portion of the judgment entered below. Upon our determination that summary judgment was improvidently entered for CG&E, we reverse that portion of the judgment and remand for further proceedings in accordance with law.

*Judgment affirmed in part,*

---

[3] Section 139.02 of the city ordinances provides:

"The [Safety-Service] Director shall supervise the improvement and repair of streets, avenues, alleys, lands, lanes, squares, wharves, docks, landings, markethouses, bridges, viaducts, aqueducts, sidewalks, playgrounds, sewers, drains, ditches, culverts, ship channels, streams and water courses, the lighting, sprinkling, and cleaning of public places and the construction of public improvements and public works, except as otherwise provided in Title VII of the Ohio Revised Code."

*reversed in part and cause remanded.*

SHANNON, P.J., and BLACK, J., concur.

DOAN, J., dissents.

DOAN, J., dissenting. I respectfully dissent from the decision of my brothers for the reason that the Ohio Supreme Court in *Otte* v. *Dayton Power & Light Co.* (1988), 37 Ohio St. 3d 33, 523 N.E. 2d 835, while not stating so in the syllabus, has clearly adopted the proposition that a public utility meets the required standard of care enunciated in *Hetrick* v. *Marion-Reserve Power Co.* (1943), 141 Ohio St. 347, 25 O.O. 467, 48 N.E. 2d 103, if it follows industry standards. The appellee indisputably followed and conformed to the National Electric Safety Code in the installation and maintenance of the lines involved in this matter, and such fact is dispositive as decided by the trial court.